## AFFIDAVIT

I, Thomas L. Doud, being duly sworn, hereby depose and state as follows: I am a Special Agent with United States Drug Enforcement Administration, assigned to DEA's Burlington, VT office. I have been a DEA agent for almost 29 years.

1.  This affidavit is offered to demonstrate that probable cause exists to believe that a male named Andrew Dante Williams, age 24, has committed a violation of 21 U.S.C. § 846, by conspiring to distribute Oxycodone. This affidavit is offered in support of a criminal complaint alleging that Williams committed such a violation in the District of Vermont during June 2012.

This affidavit contains information provided by investigators of other law enforcement agencies. Some of the information within this affidavit has been passed to me by other law enforcement officers. Additionally, this affidavit contains information that I have obtained first hand. This affidavit does not provide all of the details known by law enforcement officers about Williams' illegal activities, but is intended to offer sufficient demonstration of probable cause to believe that Williams has committed a violation of Title 21 during the past several weeks.

2.  During the past week, DEA-Burlington, Vermont Resident Office investigators and I have debriefed a Lamoille County Sheriff's Department Confidential Source (CS) regarding its knowledge of the Vermont oxycodone trafficking activities of a black male known to CS by the nickname of "D", whom CS believed to be from New Jersey or Pennsylvania. Subsequent investigation revealed the identity of "D" to be Andrew Dante Williams, DOB-6/13/88, of Philadelphia, PA. Thus, in this affidavit, any references to "D" made by the CS and others who know Williams by this nickname will be listed as "Williams." During discussions that investigators had with CS, it reported the following:

1

A) A year ago, CS used oxycodone and purchased quantities of it from Matt Cole of St. Johnsbury, VT. CS had become acquainted with Cole through Joseph Ferdette, who worked for CS' business in central Vermont. Ferdette was also involved in oxycodone distribution with Cole.

B) CS learned from Cole and Ferdette that Cole's oxycodone supplier was a black male nicknamed "D" (hereinafter, "Williams") who claimed to be from New Jersey.

C) Williams made weekly trips to Vermont to supply oxycodone to distributors in Rutland, White River Jct., and St. Johnsbury, VT. Due to some concerning recent activity in Rutland, Williams was conducting business with Rutland associates on the other side of Vermont, in the White River Junction area, because he wanted to avoid being in Rutland (see below information about an April 12, 2012 oxycodone arrest of Sara Schoenwetter; during the arrest, Schoenwetter told police that Williams was her source of supply for oxycodone).

D) Williams usually traveled in a rental car, and was often accompanied by one or two other black males.

E) When Williams sold oxycodone to Cole, they would most often meet at different business establishments in White River Jct., Vermont or across the Connecticut River in West Lebanon, NH. During several of these transactions, Cole was accompanied by Ferdette, thus Williams has seen and met Ferdette.

F) Several weeks ago, Cole terminated business with Williams because Cole had accumulated a $1400 debt to Williams, and Williams was no longer willing to sell to Cole. When the business relationship stopped, Cole told Williams that Williams could

make significant money (compensating Williams for Cole's debt) from selling directly to Ferdette. Williams expressed a willingness to do this. Cole then provided the phone number of CS to Williams, claiming that this phone number belonged to Ferdette. (It was believed by CS that Ferdette did not actually have the ability to call Williams directly.)

G)   Williams then began to call CS (thinking he was speaking with Ferdette, who he had already met), and actively recruited CS to start selling oxycodone for D. In phone and text conversations with Williams, CS expressed an interest in purchasing oxycodone from Williams, but never actually did consummate a transaction with Williams, and did not ever even actually meet Williams in person. In recent weeks, Williams and CS have spoken via phone and text on numerous occasions during which they have spoken about a potential relationship where Williams would supply oxycodone (Percocet 30mg) to CS for $25 per tablet. The phone number being utilized by Williams was 215-531-4811. That area code covers the Philadelphia, PA area. I checked with phone company records and determined that it is a Trac/Boost type phone (pre-paid) in the name of "Frank Sinatra" and its toll records show numerous calls to Vermont phone numbers, including contact with a number assigned to individuals in the White River Junction and Rutland areas.

H)   CS reported to agents that CS believed it could orchestrate a transaction with Williams such that Williams would show up at a White River Jct. business establishment with 300 Percocet tablets, intending to meet with CS and sell the pills to CS. CS, who is on court ordered conditions of release requiring it to remain under house arrest, was not available to conduct an in-person meeting with Williams, but was willing

3

to telephonically negotiate the deal so that agents could hopefully see Williams arrive at the pre-arranged meet site, and take enforcement action against Williams. Because CS has never met Williams, CS could not provide any biographical description of him.

    I)  In furtherance of the effort to arrange for a transaction with Williams, from the evening of Wednesday, June 6th until the morning of June 12, 2012, CS exchanged numerous telephone calls and text messages with Williams. During the telephonic negotiations, it was discussed that CS would have $7,400 to give to Williams to put some money toward Cole's debt, and to purchase as many Percocet tablets as Williams was willing to provide. Williams indicated to CS that Williams would be willing to provide 300 tablets to CS for that amount of money. These negotiations intensified during the weekend of June 9th and 10th, and by June 11th, Williams was telling CS that Williams was in Vermont and ready to meet. Due to unavailability of agents, the deal was not able to occur until the morning of June 12th. During the evening of June 11th and the morning of June 12th, CS and Williams made arrangements to conduct the transaction at 11:00 am of June 12th at the McDonald's Restaurant on Sykes Mountain Avenue in White River Junction, VT.

3.  It should be mentioned that further investigation of this matter on June 11th resulted in learning that on April 12, 2012, Rutland, VT Police arrested Sara Schoenwetter at her residence at 21 Baxter Street in Rutland, after executing a search warrant there. During the search, police recovered oxycodone tablets and more than $5,000 cash. Schoenwetter cooperated with police and told them that she had recently been distributing Percocet 30mg tablets for a black male nicknamed "D" or Drew, who is believed to be from the Philadelphia, PA area, and

who uses phones with Pennsylvania area codes. She said that Williams has frequently delivered Percocet (oxycodone) tablets to her "on the front" after which he will meet with her to collect the money she has made from selling the pills. She believed that he stayed in motels when in Vermont conducting his drug distribution business.

4.      Based upon the above information, other agents and I established surveillance in the area of the White River Junction McDonald's yesterday morning shortly before 11:00am. At that time, agents who were with CS at a location nowhere near the McDonald's, had CS finalize telephonic negotiations with Williams, leading Williams to believe that CS was inside McDonald's awaiting his arrival. During an exchange of calls, Williams told CS that Williams was in West Lebanon, NH, was traveling in a red truck, and would be at the McDonald's shortly. At about 11:20, agents saw a black New York registered Jeep Cherokee, containing two black males (later identified as Williams (passenger) and Montae Carney (driver)) drive near the area of the McDonald's and eventually enter the parking lot. They drove slowly around the lot while Williams was seen to be holding his phone to his ear, slumped down and back in the passenger's seat. This observation coincided with the timing of CS' final calls to Williams telling Williams of CS' supposed presence in the restaurant. Williams told CS that they were outside in the parking lot and to come outside. CS reported that it did not see any red truck and Williams finally stated that they were actually in a gray Jeep. During this time, Carney temporarily parked in a parking space in the McDonald's parking lot, and then moved, continuing to circle the restaurant parking lot. Agents stopped the Jeep and placed Carney and Williams in custody. Williams was found to be in possession of two phones, one of which was found to ring when the number of

215-531-4811 was dialed. At first, Williams would not tell agents his name, but later admitted that his nickname was "D".

5. Both men were taken to the Hartford, VT Police station for questioning. The questioning took place after each was advised of their Constitutional (Miranda) Rights, acknowledging that they understood their rights, and acknowledging that they were willing to talk to the agents. Although Williams was not very cooperative and made very few statements, mostly denying that he was involved in drug distribution, he did say some things that inferred his involvement in drug sales. Examples of such statements were:

   A) He said that his "cousin" (Carney) had nothing to do with this and should not get in trouble because this matter only involved Williams.

   B) He said that he wanted to cooperate with agents but that he was "afraid".

   C) He said that he was willing to help agents if they guaranteed that he could "walk away" from being charged.

   D) He said that he did not trust the agents because he felt that even if he tried to cooperate with police, they were going to screw him anyway.

   E) He said that he realized he had done wrong, had broken the law, and was now going to be a man and take responsibility for his actions.

During this attempted interview, Williams said that his purpose for being at the McDonald's was to meet with a male who was going to give him $7,400.

6. During an interview of Carney, Carney claimed that he was not involved in selling drugs, and was only present because he had recently been accompanying Williams on trips between Philadelphia and Vermont, driving Williams, and obtaining rental cars and hotel rooms

for their use (although paid for by Williams). Carney said that Williams sold drugs to individuals in Vermont and nearby New Hampshire, but that he didn't know any particulars about Williams' business. Carney stated that they were currently staying at Room 304 of the Baymont Motel in West Lebanon, NH and consented to a search of that room. Searching agents subsequently seized approximately 12 tablets of suspected oxycodone and approximately $3,500 from the room.

7. Thereafter, as further demonstration of his willingness to cooperate, Carney stated that he thought he could telephonically arrange a meeting with one of Williams' customers who presently owed money to Williams, and that the subject would probably bring drug money owed to Williams to such a meeting. Carney looked in Williams' phone and identified a number of 802-342-9641 as the number belonging to this subject. This number appeared under Williams' contacts as "R", and Carney said that he believed this person's name to be Ron. Agents then had Carney place a recorded call to this number and Williams spoke with a male who acknowledged that he was prepared to bring money to Carney. During a series of phone calls, the two agreed to meet at the White River Junction McDonald's to conduct the payment transaction which Ron claimed would be comprised of $3,100. It was expected that "Ron" would arrive sometime between 4:30 and 5:00pm. Surveillance of the McDonald's was established, and Carney was with surveillance agents in Carney's vehicle. Carney told agents that Carney and Williams had met with Ron the previous day and that Ron would recognize Carney's Jeep. Shortly after 5:00 pm, a white male later identified as Ronald Hall arrived in a car containing three other people at the McDonald's and Ron subsequently approached Carney's Jeep on foot. Upon arrival at the Jeep, ~~Carney~~ Hall was arrested and found to be in possession of $3,100.

TJ 6/13/12                                              7

8. Hall cooperated with agents and told me the following about his oxycodone trafficking activities:

A) He had met Williams in Rutland, by chance on the street, about a year ago (later estimating it to be about nine months ago) and struck up a conversation in which Williams asked if Hall knew anyone who wanted pills, and if Hall wanted pills.

B) Since Hall was an oxycodone user, he took up this opportunity and developed a relationship with Williams in which Williams began supplying Percocet 30mg tablets to Hall on a weekly basis.

C) Originally, Hall received 25-50 tablets at a time from Williams, approximately once every week to two weeks. He paid Williams $25 per tablet and sold them to 10-15 different people in Rutland for $35 per tablet.

D) In recent months, the amount of tablets received from Williams increased to 100 at a time. Also, Williams began to "front" these pills to Hall, whereas in the past it was a cash-on-delivery relationship.

E) Over the past week, Hall received 150 oxycodone tablets from Williams on two occasions. For the first batch, he paid Williams $3,750 on June 10th or 11th. When arrested by agents, he was in the process of making a $3,100 partial payment for the second $3,750 allotment of pills that he had received from Williams on June 10th.

9. Finally, during the evening of June 12th, Bureau of Alcohol, Tobacco, Firearms, and Explosives Resident Agent in Charge James Mostyn and I met with Sara Schoenwetter in Rutland, VT. She told us that during the six or seven weeks leading up to her April 12, 2012 arrest by Rutland Police on oxycodone possession charges, she had been selling several hundred

oxycodone tablets per week on behalf of Williams who supplied them to her. She estimated that Williams provided her with 300 tablets about twice a week for the six or seven weeks prior to April 12th. Williams charged her $25-30 per pill, and she sold the pills to various people in Rutland for usually about $30 to 35 per pill. We showed her pictures of Carney and Williams. She said that she did not recognize Carney, but identified the picture of Williams as the individual she had known as "D" or "Andrew", and that he was the person who had supplied her with thousands of Percocet tablets prior to her arrest.

10. Based on the above, I believe that probable cause exists to believe that Andrew Williams has conspired with others in the District of Vermont during June 2012 to distribute oxycodone in violation of 21 U.S.C. § 846.

6/13/12
Date

Special Agent Thomas L. Doud
Drug Enforcement Administration

Sworn to and subscribed before me this 13th day of June, 2012

Honorable John M. Conroy
United States Magistrate Judge